```
UNITED STATES DISTRICT COURT                          USDC SDNY
SOUTHERN DISTRICT OF NEW YORK                         DOCUMENT
------------------------------------------------------------X   ELECTRONICALLY FILED
                                              :              DOC #:_____
ERIC JAMEL LESANE,                            :              DATE FILED: 7/6/18
                               Plaintiff,     :
                                              :              16 Civ. 3049 (LGS)
              -against-                       :
                                              :              OPINION AND ORDER
THE UNITED STATES OF AMERICA,                 :
                                              :
                               Defendant.     :
                                              :
------------------------------------------------------------X
```

LORNA G. SCHOFIELD, District Judge:

The sole remaining claim in this case is by pro se Plaintiff Eric Jamel Lesane against the United States of America for medical malpractice claim under the Federal Tort Claims Act ("FTCA"). The Government moves for summary judgment under Federal Rule of Civil Procedure 56. The Government's motion is granted.

## I.    BACKGROUND

The facts below are drawn from the Government's Rule 56.1 Statement[1] and other submissions on this motion, and are construed in Plaintiff's favor as the non-moving party. *See Wright v. N.Y. State Dep't of Corr.*, 831 F.3d 64, 71–72 (2d Cir. 2016). The following facts are undisputed and largely based on Plaintiff's medical records.

### A.  Plaintiff at the MCC: June 5, 2012, to November 6, 2013

From June 5, 2012, to November 6, 2013, Plaintiff was incarcerated at the Metropolitan Correctional Center ("MCC") in New York, New York. On May 15, 2013, Plaintiff saw E. Ramos, an MCC medical provider, complaining that he had scratched his left eye on a windowsill the day before. Ramos observed "swelling and redness of the left periorbital area" but "no

---

[1] Only the Government filed a Rule 56.1 Statement. Plaintiff did not submit any evidence or counterstatement of undisputed facts in support of his claim.

tearing." Plaintiff's vision at that time was 20/20 and Plaintiff denied pain. Ramos' assessment was that Plaintiff suffered a left eye "contusion" (i.e., bruising, black eye). Ramos ordered an x-ray and follow up as needed.

On May 20, 2013, Dr. Anthony Bussanich, a physician at the MCC, examined Plaintiff. Plaintiff reported that he felt "the left orbital area is not 'right'" and that he could "blow air into his eye from his nose." Dr. Bussanich observed that Plaintiff's "xrays raised the possibility of a fracture on wet reading." Dr. Bussanich referred Plaintiff for an MRI of his left eye, to rule out a fracture floor in the left orbit. The MRI was approved the next day.

On June 17, 2013, Plaintiff visited the Radiology Department at New York Downtown Hospital where a computerized tomography ("CT") scan was conducted on both of his eyes. The CT scan revealed that there was "no preorbital fracture or . . . other orbital injury." Dr. David A. Boyajan at the New York Downtown Hospital also noted that Plaintiff's "globes are intact," the "ocular muscles and intraconal structures are preserved," and "[n]o osseous lesion or fracture is visualized." Lesane saw Dr. Bussanich later the same day and still complained of being able to "blow air into" his left eye and decreased vision in the left eye. Dr. Bussanich recommended an ophthalmology referral, which the MCC approved on June 21, 2013. On June 26, 2013, an optometrist examined Plaintiff, but the results of the exam are not included in the summary judgment record.

On August 12, 2013, Dr. Bussanich examined Plaintiff again. During this meeting, Plaintiff reported that his eye symptoms had improved and that he could no longer blow air into his left orbit. Dr. Bussanich stated in this report that Plaintiff might have had a hemorrhage in the lateral lower quadrant of his left eye, and noted that Plaintiff "[had] an ophthalmology consult pending" and that he would "try to schedule it ASAP." Dr. Bussanich recommended that

Plaintiff follow up in one month.

On September 9, 2013, Plaintiff followed up with Dr. Bussanich. Plaintiff reported that "the vision in his left eye is worse" and that "he is concerned about losing his vision." Dr. Bussanich noted that Plaintiff had an appointment scheduled with an ophthalmologist at Brooklyn Hospital the following week.

On September 16, 2013, Dr. Emily Su at New York Eye and Ear Infirmary ("NYEEI") examined Plaintiff and concluded that "[t]here [was] a myopic shift [i.e., increased near-sightedness] of the left eye with best corrected acuity decreased in the left eye [to] 20/100." Dr. Su recommended that Plaintiff receive SLO-OCT (optical coherence tomography -- scanning laser ophthalmoscope) of the macula and RNFL (retinal nerve fiber layer) and that he follow up to see "any MD" six weeks after the test. On the same day, Dr. Robert Beaudouin at the MCC promptly incorporated Dr. Su's plan into the MCC's treatment plan for Plaintiff.

On September 27, 2013, Dr. Bussanich placed a medical hold on Plaintiff's case, pending evaluation or treatment of his left eye condition. In the meantime, on October 18, 2013, Plaintiff received eyeglasses from MCC to address the declining vision in his left eye. On October 21, 2013, Plaintiff returned to NYEEI, per Dr. Su's referral, for diagnostic testing, where pictures of his eyes were taken.

Plaintiff was sentenced on October 25, 2013, in the criminal case against him and judgment was entered November 1, 2013. On October 30, 2013, Plaintiff refused his NYEEI follow-up appointment so that he could see his mother before being transferred to Rikers Island, despite advice that his eye condition could worsen and that he could suffer long term disability or blindness. On November 4, 2013, Dr. Bussanich examined Plaintiff once again, concluding that Plaintiff's "eye complaints remain stable," Plaintiff's eyeglasses were helping his eye condition,

"diagnosis is still not clear" and "[NYEEI] follow up [needs] to be rescheduled." The notes state that Dr. Bussanich was unable to do a thorough eye exam because of lack of time and an emergency situation with respect to another inmate. Before Plaintiff could undergo any further treatment or examination, Dr. Bussanich was "forced to take [Plaintiff] off medical hold because he [was] being transferred over to state authorities" in light of the November 1, 2013, judgment.

**B. Plaintiff in State Custody: Between November 6, 2013 to July 15, 2014**

On November 6, 2013, Plaintiff was transferred from the Bureau of Prisons ("BOP") federal custody, at the MCC, to state custody with the New York State Department of Corrections and Community Supervision ("DOCCS"). The Intra-System Transfer form, dated November 6, 2013, states that Plaintiff has low vision in one eye, a vision screen was scheduled for September 25, 2014, and a follow up with an ophthalmologist was recommended. The state intake health form states the following about Plaintiff's eyes: "PERRLA, EOMI, no nystagmus, conjunctiva clear, non-icteric sclera" and that "disc not visualized" as to fundi.[2] The forms also indicate that Plaintiff's neurological exam was normal.

A DOCCS Health Screening Form, dated June 16, 2014, states that Plaintiff complained of "eye injury since 2013 [and] blurry vision since," and that he has two pairs of glasses. The form also states that Plaintiff's vision in his right eye is 20/15 but his vision in his left eye is "20/ [complains of] can't see." The form further notes that Plaintiff's eyes and pupils are normal and that Plaintiff had been complaining of blurry vision since 2013.

The DOCCS Inter-System Transfer/Pre-Screening Form, dated July 11, 2014, states that

---

[2] PERRLA stands for "pupils equal, round, react to light, accommodation." EOMI stands for "extraocular movement intact." Nystagmus is uncontrolled eye movements. Conjunctiva is a mucous membrane in the eye. Non-icteric sclera means no jaundice. Fundi is a part of the eye that is opposite to pupil.

Plaintiff has never been diagnosed as legally blind in either eye. No vision problem is listed among the "medical problems." The DOCCS documents do not otherwise indicate whether Plaintiff received any treatment for his vision complaints while in state custody.

### C. Plaintiff Returns to BOP Custody: July 15, 2014 to Present

On July 15, 2014, Plaintiff returned to BOP federal custody at the Metropolitan Detention Center ("MDC") in Brooklyn, New York. Between July 29, 2014, and the present he has been incarcerated at seven different federal prisons.[3] Plaintiff's MDC vision screening memo states that based on a vision screen conducted on July 29, 2014, Plaintiff's vision in the left eye is 20/70, without an indication of any other ongoing problems.

According to a Complaint that Plaintiff filed in a separate action, in November 2014, while at USP-Hazleton in West Virginia, Plaintiff was involved in an altercation with guards.

On February 5, 2016, Plaintiff reported to Jodi Jordan, a physician assistant at USP-Lewisberg in Pennsylvania, for the first time since 2014, painless, but worsening, left eye vision in the previous several weeks. Plaintiff was referred for an optometry exam, as his last exam had been in 2013. On March 16, 2016, Plaintiff was transferred to USP-Allenwood in Pennsylvania, and the next day, reported worsening vision but no pain in his left eye to Thomas Wickham, a physician assistant, who requested an eye exam.

On April 8, 2016, Plaintiff showed Wickham his old medical records describing a torn

---

[3] On July 29, 2014, Plaintiff reentered the BOP custody at the MDC in Brooklyn, New York. Between August 11, 2014, and February 17, 2015, Plaintiff was incarcerated in USP-Hazleton in West Virginia. Between February 17, 2015, and March 16, 2016, Plaintiff was incarcerated in USP-Lewisberg in Pennsylvania. Between March 16, and August 25, 2016, Plaintiff was incarcerated in USP-Allenwood in Pennsylvania. Between August 25, 2015, and April 24, 2017, Plaintiff was incarcerated in USP-Canaan in Pennsylvania. Between April 24, 2017, and July 14, 2017, Plaintiff was incarcerated in USP-Coleman in Pennsylvania. Since July 14, 2017, Plaintiff has been incarcerated in USP-Beaumont in Texas.

retina and eye injury, and said that over the prior four months he experienced increasing and occasionally sharp pain in his left eye, with some double vision, some foggy vision and light sensitivity. Wickham examined Plaintiff and found that his left eye had a normal light reflex and no other abnormalities. Wickham noted that "[t]his is not a new issue" and referred Plaintiff to optometry for a retinal evaluation.

The optometry exam, performed on April 20, 2016, revealed that Plaintiff's vision in his left eye was 20/400, and Plaintiff was diagnosed with astigmatism for the first time. On April 21, 2016, Wickham referred Plaintiff for an off-site ophthalmology examination.

On May 19, 2016, Dr. Daniel Fassero, at the Eye Center of Central PA conducted an off-site ophthalmology exam of Plaintiff. The report states that there was "no evidence of retinal or optic nerve pathology," and "the optic nerve appears healthy," but describes possible causes for his vision loss. Dr. Fassero stated that Plaintiff might need an evaluation by a neuro-ophthalmologist and diagnosed Plaintiff with a "subjective" visual disturbance. Dr. Fassero recommended a return visit in four to six weeks.

On July 19, 2016, Plaintiff returned to Dr. Fassero, who examined Plaintiff and concluded that "no APD [or] RNF thinning [was observed,] although ERC shows a decreased ratio OS."[4] Dr. Fassero once again diagnosed Plaintiff with a "subjective" visual disturbance and recommended follow up with a neuro-opthalmologist. The next day, the physician assistant at the prison summarized Dr. Fassero's conclusion: "The ophthalmologist was unable to find an objective problem with the anterior, posterior eye, or the retina."

On September 16, 2016, after his transfer to USP-Canaan in Pennsylvania, Dr. Diane

---

[4] ADP refers to "Afferent Pupil Defect." RNF refers to "Retinal Nerve Fiber." ERC refers to "Eye Rotation Centre." And OS refers to the left eye.

Sommer examined Plaintiff and noted that he had "sustained a blunt force trauma to the left eye a few years ago" and had low vision in the left eye, but the "ophthalmologist cannot find a cause." Dr. Sommer requested an on-site MRI to rule out optic neuritis as the cause. The MRI report from November 17, 2016, stated that the MRI of the brain was "unremarkable" with "no definite evidence of optic neuritis, however, detailed images of the orbits were not obtained. No evidence of blood product on the GRE sequences."

On December 7, 2016, Dr. Vithal Dhaduk, an outside neurologist at Professional Neurological Associates, P.C., examined Plaintiff. Dr. Dhaduk reported that Plaintiff had a "vague history" -- "headaches come and go. He doesn't know how many headaches he has in a month." He concluded that Plaintiff might be experiencing "common migraine headaches," and for issues with eyesight should follow up with an eye doctor.

On December 19, 2016, Kenneth Kaiser, a physician assistant at USP-Canaan, examined Plaintiff for his complaint of recurring headaches, which Plaintiff believed was secondary to his low vision. Plaintiff stated that his vision in the left eye is limited to light perception and general outline of objects. Kaiser recommended "consult optometry, follow up as needed."

On April 24, 2017, Plaintiff was transferred to USP-Coleman in Florida. In his Health Intake Assessment/History form, Plaintiff reported that he was suffering from a "painful condition" in his eye and that he wore glasses. The BOP Inmate Intra-System Transfer record stated that Plaintiff had "[l]ow vision [in] one eye," [m]igraine," "[a]stigmatism" and "[h]eadache centered behind left eye."

On May 2, 2017, Dr. Mark Tidwell at USP-Coleman examined Plaintiff about his vision problems. Dr. Tidwell's notes state that Plaintiff complained of light sensitivity, decreased vision and blurred vision, but reported a normal MRI. Dr. Tidwell requested an onsite optometry visit

7

"ASAP" and referred Plaintiff for an off-site neuro-ophthalmology evaluation.

On July 14, 2017, Plaintiff was transferred to USP-Beaumont in Texas. The Inmate Intra-system Transfer record, dated the same date, stated that Plaintiff's current health problems included "[l]ow vision [in] one eye," "[a]stigmatism," "[m]igrane," "[h]eadache centered behind left eye," and painful condition in his left eye. On July 26, 2017, Candy Brekel, a licensed vocational nurse, examined Plaintiff and concluded that his health was largely normal. The examination made no mention of vision problem, and recommended continuing over-the-counter pain medication for tooth pain and migraines. On July 31, 2017, Dr. Sreedhar Polvarapu of USP Beaumont examined Plaintiff. During this meeting, Plaintiff represented that he was "doing Okay" and had "[n]o new probems/[c]oncerns/[c]omplaints." The exam also revealed "[n]o visual loss, blurred vision, double vision or yellow sclerae" and "[n]o headache." Plaintiff's low vision in the left eye and migraine were recorded as in "remission."

### D. Procedural History

Plaintiff commenced this action on April 22, 2016, against the BOP, MCC and certain individuals, asserting claims under *Bivens* and the FTCA. On May 20, 2016, Plaintiff's claims were dismissed except the FTCA claims, and the United States was substituted as a Defendant.

On June 1, 2016, Plaintiff filed an action in the Northern District of West Virginia, where he claimed that, as a result of the November 2014 altercation at a West Virginia BOP, he suffered "days of swelling to the face, head, jaw, eye socket, bleeding from the nose and ears, trouble breath[ing] from the excessive usage of [pepper] spray . . . causing further serious lifelong handicap *and perman[en]t irreversible loss of left eye vision with continuing rapid deterioration of left over left eye vision . . . .*" (emphasis added). (Dkt. 73-1). The case was subsequently dismissed for failure to comply with the local rules.

On April 19, 2017, the Court in the present case granted in part and denied in part Defendants' motion to dismiss. The only surviving claim is Plaintiff's FTCA claim against the United States of America for medical malpractice in connection with the treatment of Plaintiff's left eye.

## II. STANDARD

Summary judgement is proper where the record establishes that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of N.Y.*, 822 F.3d 620, 631 n.12 (2d Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (alterations omitted). "[M]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Id.* (internal quotation marks omitted; alteration in original).

Plaintiff's pro se status requires the Court to "construe his submissions liberally and interpret them to raise the strongest arguments that they suggest." *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 224 (2d Cir. 2014) (internal quotation marks omitted).

## III. DISCUSSION

Summary judgment is granted because there are no genuine issues of disputed fact as to whether the Government deviated from the applicable standard of care and whether the Government's action was a proximate cause of Plaintiff's injury.

### A. Failure to Adduce Expert Testimony

Summary judgment is granted because Plaintiff failed to adduce any medical expert testimony to support the claim that Government caregivers engaged in medical malpractice. Liability under the FTCA is determined by the law of the place where the act or omission occurred. *See Liranzo v. United States*, 690 F.3d 78, 86 (2d Cir. 2012) ("[T]he FTCA directs courts to consult state law to determine whether the government is liable for the torts of its employees."). Plaintiff received medical treatment in federal prisons located in four different states -- New York, West Virginia, Florida and Pennsylvania. Regardless of which state law applies, in a medical malpractice action, "a plaintiff must prove through expert medical opinion, (1) the standard of care in the locality where the treatment occurred, (2) that defendant breached that standard of care and (3) that the breach of the standard was the proximate cause of injury," *Bloch v. Gerdis*, No. 10 Civ. 5144, 2011 WL 6003928, at *4 (S.D.N.Y. Nov. 30, 2011) (quoting *Gibson v. D'Amico*, 470 N.Y.S.2d 739, 740 (3rd Dep't 1983)), unless the testimony is within the ordinary knowledge and experience of the jury, *Vale v. United States*, 673 F. App'x 114, 116 (2d Cir. 2016) (summary order) (applying New York law); *see also Toogood v. Owen J. Rogal, D.D.S., P.C.*, 824 A.2d 1140, 1145 (Pa. 2003); Fla. Stat. Ann. § 766.102 (West 2013); W. Va. Code Ann. § 55-7B-7 (West 2015). "The area of knowledge considered within the competence of a lay [factfinder] to evaluate is particularly narrow." *Nabe v. United States*, No. 10 Civ. 3232, 2014 WL 4678249, at *9 (E.D.N.Y. Sept. 19, 2014) (internal quotation marks omitted). "For example, even where the surgeon left a needle inside the patient's body, if the defendant can proffer any evidence to support the view that a proper standard of care was followed, the plaintiff cannot prevail without introducing expert medical testimony." *Id.* (citing New York law). "This requirement for a plaintiff to submit expert medical opinion applies equally to pro se inmate

plaintiffs." *Urena v. Yan Wolfson, M.D.*, No. 09 Civ. 1107, 2012 WL 958529, at *5 (E.D.N.Y. Mar. 20, 2012) (citation omitted); *see also Snyder v. Mount Nittany Med. Ctr.*, No. 1547 MDA 2016, 2017 WL 2304423, at *1 (Pa. May 26, 2017); *Wheeler v. Corizon Med. Health Care Servs.*, No. 16 Civ. 96, 2016 WL 7743516, at *3 (N.D. Fla. Dec. 27, 2016) (applying Florida law); *but see Sumpter v. United States*, No. 16 Civ. 8951, 2018 WL 2170505, at *6 (S.D.W. Va. May 10, 2018) (staying an action to give an opportunity to a pro se plaintiff to comply with the statutory requirements of a medical malpractice claim) (applying West Virginia law).

Defendant has proffered evidence that a proper standard of care was followed. Defendant responded to Plaintiff's vision complaints with immediate medical attention, diagnostic tests and referral to outside specialists. Despite repeated medical examinations, no medical professional could assign any physical cause to Plaintiff's symptoms. Defendant nevertheless continued to provide medical attention and treatment (such as eyeglasses and medication for migraine headaches) in response to Plaintiff's ongoing complaints.

Plaintiff's claim alleging declining vision following an injury to his left eye must be substantiated by expert testimony as to the standard medical care within the community, deviation from the standard of care and causation. *See e.g.*, *Shields v. United States*, 446 F. App'x 325, 326 (2d Cir. 2011) (summary order) (affirming the grant of summary judgment to the Government on medical malpractice claim because incarcerated pro se plaintiff failed to adduce medical expert testimony); *Nabe*, 2014 WL 4678249, at *9 (granting summary judgment on a medical malpractice claim of a pro se prisoner plaintiff against the Government, because the plaintiff "has provided no expert testimony to satisfy either prong of the Second Circuit's malpractice standard "); *Kavazanjian v. Rice*, No. 03 Civ. 1923, 2008 WL 5340988, at *9 (E.D.N.Y. Dec. 22, 2008) (granting summary judgment on medical malpractice claim on the

ground that the pro se plaintiff "has adduced no evidence -- expert or otherwise -- as to the applicable standard of care that [the defendant] supposedly breached"); *see also Snyder*, 2017 WL 2304423, at *1; *Wheeler*, 2016 WL 7743516, at *3.

Plaintiff had numerous opportunities to provide expert testimony. On October 31, 2016, Defendants filed a letter requesting that Plaintiff be required to produce a medical expert. On December 2, 2016, a status conference was held to discuss discovery issues, including Plaintiff's securing expert testimony for his claim. On December 2, 2016, the Court Order required Plaintiff to contact any doctors who had treated him for his eye injury and file a letter informing the Court whether any of his doctors were willing to testify on his behalf. Plaintiff failed to file any letter by the deadline. On January 18, 2017, the Court once again required from Plaintiff an update on whether he had secured expert testimony. Plaintiff failed to file any update. On February 7, 2017, the Court again required Plaintiff to report regarding his efforts to secure expert testimony. Plaintiff remained unresponsive to this court order.

Plaintiff's argument, that the Government prevented him from securing his medical expert, is rejected because Plaintiff has provided no evidence or even explanation to support this argument. Instead, the Government has been diligent in collecting Plaintiffs' voluminous medical records covering a period of more than five years, containing the names and notes of numerous health care providers employed both within and outside of the BOP system, none of which suggest -- at least on their face to a sophisticated lay reader -- any lapse in care.

**B. No Evidence of Departure from Accepted Community Practice**

Because Plaintiff is pro se, and despite his failure to adduce expert testimony, the Court has reviewed the record for evidence of any evident deviation from the standard of care and found none. *See Kirkland*, 760 F.3d at 224 (finding that a pro se litigant's claim must be liberally

construed).

Between May 15 and November 1, 2013, while in the MCC's care, Plaintiff received medical attention almost every month. On May 20, 2013, Dr. Bussanich referred Plaintiff for an outside diagnostic test when his x-ray revealed the possibility of a fracture. On June 17, 2013, Dr. Bussanich reviewed the radiology report from Plaintiffs's CT scan, which revealed no fracture or injury to the eyes, and recommended an ophthalmology referral. On September 16, 2013, the ophthalmologist at NYEEI diagnosed Plaintiff with increased near-sightedness in the left eye, and recommended additional diagnostic tests. On October 18, 2013, Plaintiff received eyeglasses for his near-sightedness. On October 21, 2013, Plaintiff returned to NYEEI for the additional diagnostic testing. However, the results of the tests are not in the record, presumably because Plaintiff refused his follow-up visit on October 30, 2013 so that he could visit with a family member before his transfer to state custody. Dr. Bussanich placed Plaintiff on a medical hold to prevent his transfer to another federal facility, but was forced to remove it as Plaintiff was transferred to state custody.

None of these actions suggests undue delay or lack of care. Rather, Dr. Bussanich and the physician assistants involved in Plaintiff's care while he was at the MCC demonstrated caution and diligence in attempting to secure specialized care to diagnose and treat Plaintiff's eye complaints. *See, e.g.*, *Nabe*, 2014 WL 4678249, at *9 (applying New York law) (finding that because the medical records on their face show that the plaintiff received "medical care immediately following his altercations with his cellmates for injures to his mouth" and that he received "extensive care . . . for the skin infection on his feet, . . . [t]he record is devoid of evidence that the plaintiff's treatment fell below the normal level of care within the medical community.").

13

On July 15, 2015, Plaintiff reentered the BOP's custody from the state custody. In February and again in March, 2016 (at two separate institutions following his transfer), Plaintiff reported decreased vision. From that point forward, Plaintiff received medical attention for his left eye approximately every two months. In April 2016, Plaintiff had an optometry exam and was diagnosed with astigmatism and was referred for an off-site ophthalmology exam. Plaintiff saw an ophthalmologist in May and July 2016, but he could not find a physical cause for what he described as Plaintiff's "subjective" visual disturbance.

After his transfer to another institution, in September 2016, another physician examined Plaintiff and noted that the ophthalmologist could not find a cause for his loss of vision in the left eye. She requested an MRI to rule out optic neuritis, but the MRI also revealed no evidence of pathology. In December 2016, an outside neurologist could not identify a cause for Plaintiff's complaints, which now included headaches. Despite Plaintiff's ongoing complaints, the optometry, ophthalmology, neurology, MRI and CT evaluations revealed no objective underlying cause for the complaints and medical professionals described his condition as "subjective." Without identifying the underlying cause for Plaintiff's vision complaints, the Government cannot be faulted for failing to provide additional treatment. *See, e.g.*, *Occhino v. Fan*, 57 N.Y.S.3d 325, 326–27 (4th Dep't 2017) (finding that the seven month delay in diagnosing the plaintiff's breast cancer does not show that the defendants deviated from the applicable standard of care where a screening mammogram showed no nodules, microcalcifications, architectural distortion, or abnormality of the skin or nipples). Then suddenly, on July 31, 2017, Plaintiff reported that the low vision in his left eye was in remission.

In his opposition, Plaintiff argues that the fact that his vision continued to decline and the BOP failed to restore his vision shows that the BOP's medical attention deviated from the

accepted community standard. This argument is rejected. That Plaintiff may have continued to experience poor vision cannot by itself support the allegation that the BOP's medical care fell below the community standard. Unfortunately, sometimes people suffer from ailments that, even with the best of care, cannot be cured. Nothing in the record suggests that Government employees were negligent or inattentive in Plaintiff's care.

### C. The Terms of Imprisonment Agreements

In opposition, Plaintiff argues that the medical records submitted by the Government violate the terms of his Imprisonment Agreement (the "Agreement") and therefore should be struck. Plaintiff appears to argue that the Agreement prevents the use of his medical records to support the Government's summary judgment motion, because any document containing his name is allegedly "trademarked" under the terms of the Agreement. This argument is rejected for two reasons. First, the terms of the Agreement do not provide trademark protection of Plaintiff's name as Plaintiff contends. Second, to the extent that Plaintiff argues that his medical record is privileged, either under the Health Insurance Portability and Accountability Act of 1996 or physician-patient privilege, Plaintiff's argument is unpersuasive. Plaintiff signed a medical release in the course of this litigation, and by bringing this action, Plaintiff has placed his medical record at issue. He cannot now attempt to preclude the use of his medical records while maintaining this suit. *See, e.g.*, *Feder v. Sposato*, No. 11 Civ. 193, 2014 WL 1801137, at *2 n. 2 (E.D.N.Y. May 7, 2014) (finding that "[w]here, however, a litigant puts his physical or mental condition into issue in the litigation, he waives his right to privacy in any relevant medical records.") (collecting cases).

## IV. CONCLUSION

The Government's motion for summary judgment is GRANTED. The Clerk of Court is

15

directed to close the motion at Docket No. 94 and close the case.

Dated: July 6, 2018
      New York, New York

                                              **LORNA G. SCHOFIELD**
                                       **UNITED STATES DISTRICT JUDGE**